[Nos. 4906–6–II; 5603–8–II.   Division Two.   June 3, 1982.]

VIRGINIA M. BLODGETT, *Respondent,* v. OLYMPIC
SAVINGS AND LOAN ASSOCIATION, ET AL,
*Appellants.*

*David Armstrong, William Hickman,* and *Richard Dunlap,* for appellants.

*Frank Peters* and *James Caraher,* for respondent.

JOHNSON, J.*—The defendants Olympic Savings and Loan Association, the owner of the property, and Drury Construction Co., the contractor, appeal from a judgment on a jury verdict awarding the plaintiff damages in the sum of $850,000 (cause 4906–6–II). Defendant Drury also appeals under cause 5603–8–II from a denial of its motion to vacate the judgment under CR 60(b)(1), (4) and (11). For the purposes of appeal causes 4906–6–II and 5603–8–II were consolidated. In view of our disposition of the appeal in 4906–6–II we deem it unnecessary to rule on the appeal in 5603–8–II. We reverse.

Olympic Savings and Loan Association was the owner of property located at the corner of Second and Pacific Avenues in Bremerton. It contracted with its codefendant Drury Construction to remodel the building on that site. Fences and a removable panel were erected by Drury.

On the morning of November 1, 1977, the plaintiff was walking on a public sidewalk next to the construction site when a gust of wind blew over an 8– by 16–foot panel. It struck the plaintiff on the head and fell on top of her, knocking her unconscious and injuring her.

On the Pacific Avenue side and the Second Avenue side,

---

*Judge Bertil E. Johnson is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

an 8–foot–high plywood fence separated the pedestrians from the jobsite. Outside the plywood fence there was a wooden walkway for pedestrians and outside of that a wood railing. The fences on Pacific Avenue and Second Avenue were connected by a removable corner panel 8 by 16 feet which ran diagonally at the intersection. It was composed of four sheets of plywood held together by two–by–four plates at the top and bottom. There were also two–by–fours that were nailed vertically at the end of each section of plywood and at each end of the fence. It was not braced with "knee braces" as were the other sections of the fence. The panel was removable to permit supply trucks to enter the building site. When the panel was removed the nails were pulled out and upon replacement it was renailed.

The defendant Drury makes 24 assignments of error, some of which are repetitive. Defendant Olympic Savings adopts the errors assigned by Drury and adds two additional assignments: (1) that the court erred in denying its motion to dismiss at the close of the plaintiff's case, and (2) the giving of instruction 19.

I

INSTRUCTION 13

Instruction 13[1] as given by the court was WPI 15.01, Proximate Cause, to which plaintiff added the words "even if such injury is unusual or unexpected." The plaintiff claims that the defendants did not take a proper exception to this instruction. We disagree. We have searched the plaintiff's brief to discover any reason given for the insertion of the phrase but find none. We can only surmise that it may have been inserted to cover the claim for damages by reason of the evidence of a rape and abortion, which

---

[1]Instruction 13 reads:

"The term 'proximate cause' means a cause which in a direct sequence, unbroken by any new independent cause, produces the event or injury complained of and without which such event or injury would not have happened, even if such injury is unusual or unexpected. There may be one or more proximate causes of an event or injury."

claim was withdrawn by the plaintiff by the giving of instruction 30.[2] It may have been inserted to inject the question of foreseeability. If so, it was improper.

The Supreme Court in the case of *Rikstad v. Holmberg*, 76 Wn.2d 265, 456 P.2d 355 (1969) said at page 268:

> The better considered authorities do not regard foreseeability as the handmaiden of proximate cause. To connect them leads to too many false premises and confusing conclusions.

*See also Maltman v. Sauer*, 84 Wn.2d 975, 530 P.2d 254 (1975); *Wells v. Vancouver*, 77 Wn.2d 800, 467 P.2d 292 (1970).

Regardless of the reason, the insertion of the phrase made the instruction confusing and it should not have been given in that form. Plaintiff in support of the instruction cites three cases: *Berglund v. Spokane Cy.*, 4 Wn.2d 309, 103 P.2d 355 (1940); *Hoseth v. Preston Mill Co.*, 49 Wash. 682, 96 P. 423 (1908); *Jordan v. Seattle*, 30 Wash. 298, 70 P. 743 (1902). None of these three cases is applicable to a definition of proximate cause.

## II
### CHAPTER 17.24

The trial court gave three instructions premised on the provisions of chapter 17.24 of the Bremerton Municipal Code. Instruction 20 recited a part of section 17.24.100; instruction 22 set forth a portion of section 17.24.130; and instruction 23 stated a portion of WAC 296-155-300 as adopted by section 17.24.340.

Chapter 17.24 is entitled "Construction on Public Property."

---

[2]Throughout the trial, plaintiff contended that she was entitled to recover damages from the defendants because several months after the accident, she was raped and later underwent an abortion. Her apparent theory was that the blow to the head resulted in brain damage, psychiatric disorders and physical disabilities that made her vulnerable to her attacker and that injury-related memory problems prevented her from recalling the incident until she was placed under hypnosis on March 1, 1979. Plaintiff abandoned this theory shortly before the end of the trial.

17.24.010 Purpose. The purpose of this chapter is to provide minimum standards, requirements, and rules and regulations governing the installation, excavation in public properties for any utility system or other purpose within the city, and movement of traffic, maintenance of safety and protection of existing improvements during such work.

17.24.020 Scope. All work done with respect to a utility system or other purpose up to the property line or to a meter, shall comply with the requirements of this chapter.

In order to interpret the above two sections and the entire chapter we have carefully read and examined each section of the chapter.

Section 17.24.030 contains the definitions:

(2) "Construction" or "Construct" means constructing, laying, maintaining . . . and using a gas distribution system.

(3) "Distribution system," "system," and/or "lines" . . . includes the gas pipes, conduits, poles, and wires, sewer and water pipe lines, . . . in any way appertaining to utilities.

. . .

(6) "Permittee" means any person, company, partnership or corporation, or its successors and assigns, holding a franchise or permission by ordinance to construct, lay, maintain, and operate over, across, upon, along, and under the present and future streets, alleys, sidewalks, curbs, roads, highways, thoroughfares, parkways, bridges, viaducts, public property, public improvements, and other places in the city a system of pipes, pipe lines, water mains, power conduits, underground wiring, gas mains, laterals, conduits, feeders, regulators, meters, fixtures, connections and attachments, appurtenances, and appliances incidental thereto or in any way appertaining thereto for the purpose of transporting, transmitting, distributing, selling, and supplying gas for heating, lighting, power, and any and all domestic, commercial, and industrial purposes and other reasons and purposes to inhabitants, persons, firms, associations, and corporations within the city for public, domestic, and industrial use, and other purposes.

. . .

(11) "Utility" or "utility system" means any gas, oil, water, sewer, light, power, telephone, television, steam, burglar alarm, distribution system, pipes, or pipe lines, conduits, poles and wires, or other facilities necessary or appertaining thereto, and railroads, both public and private, . . .

All of the other sections relate solely to the construction, excavation, trenching, tunneling, and backfilling required for the installation, maintenance, repair, and replacement of utilities as defined in section 17.24.030(11).

Section 17.24.010 is not well drawn but after a review of the definitions and the provisions of the other sections of the chapter, we interpret that section as follows:

The purpose of this chapter is to provide minimum standards, requirements and rules and regulations governing the (1) installation, (2) excavation in public property for any utility system or other purpose within the city, and (3)(a) movement of traffic, (b) maintenance of safety, and (c) protection of existing improvements during such work.

Thus, "for any utility system or other purpose" relates back to "excavation in public property." Plaintiff contends that the phrase "other purpose" standing alone brings the defendants within section 17.24.010, but she neglects to read the entire section which indicates that the phrase "or other purpose" relates back to the word "excavation."

This was a simple case in which negligence was claimed in the erection and maintenance of fences and a diagonal panel which surrounded a building site on private property. There is no evidence of any excavation on public property for a utility or other purpose. The use of the phrase "other purpose" in section 17.24.010, however, is intriguing. In reviewing the entire chapter we find these words used only in section 17.24.030(6) wherein "permittee" is defined, and in each instance it is used in reference to the transmission and distribution of gas by a utility. From our review of the entire chapter we are compelled to the conclusion that it is directed to the regulation of utilities in the construction and installation on public properties.

Instruction 20[3] is a part of the first section of 17.24.100, from which is deleted "all of which shall be approved by the city engineer", and a sentence from the second paragraph. However, the entire section is devoted to the placing of barricades, signs, lights and flares around an excavation, and to the proper intervals between such lights, flares and obstructions along the trenches. As has been set forth above, there were no excavations or trenches in the case at bench.

Instruction 22 is a portion of the first paragraph of section 17.24.130[4] from which has been removed "and whenever a trench crosses the roadway." Again, that section alludes to a trench in the roadway which does not appear in the evidence in this case. The instruction also refers to the "permittee." We have set forth above the definition of a permittee (17.24.030(6)). The defendants do not qualify as permittees under this definition. The plaintiff does not claim that the defendants were in the utility business, or that they dug, excavated or trenched for the installation, laying or maintenance of any pipes, wires, water mains, power conduits, sewers or gas mains as described in chapter

---

[3]Instruction 20 states:

"You are instructed that the ordinances of the City of Bremerton provide, in part, as follows:

"17.24.100 Barricades, Signs, Lights and Flares. In case any public properties shall be dug up, excavated, undermined, cut, disturbed, or obstructed, or any obstruction placed thereon, the person causing the same shall erect and so long as the condition exists, and any danger may continue, maintain around the portion of the public properties a good and sufficient barrier, watchman, guards, barricades, signals, signing such as "Construction", "No Parking", "Street Closed", and "Detour", lighting, and such other safeguards as may be required, at all unsafe places on the work at his own expense to protect persons and property from injury, . . .

". . . Special care shall be exercised to prevent vehicles, pedestrians, and livestock from falling into open trenches or being otherwise harmed as a result of the work."

[4]"17.24.130 Maintaining Traffic. The permittee shall construct and maintain adequate and safe crossings over excavations and across public properties under improvement to accommodate vehicular and pedestrian traffic at all street intersections . . ."

17.24.

██ These instructions, 20, 22 and 23, injected collateral issues which were not relevant, justified by the evidence, pertinent to the case, or confined to the issues. They misled the jury. It is axiomatic that prejudicial error occurs when the jury is instructed on issues that lack substantial evidence to support them. *Bartlett v. Hantover,* 84 Wn.2d 426, 526 P.2d 1217 (1974); *Izett v. Walker,* 67 Wn.2d 903, 410 P.2d 802 (1966); *Reynolds v. Phare,* 58 Wn.2d 904, 365 P.2d 328 (1961); *Manzanares v. Playhouse Corp.,* 25 Wn. App. 905, 611 P.2d 797 (1980); *Haynes v. Moore,* 14 Wn. App. 668, 545 P.2d 28 (1975); *Brown v. Cannon,* 6 Wn. App. 653, 495 P.2d 705 (1972); *Day v. Goodwin,* 3 Wn. App. 940, 478 P.2d 774 (1970). It was prejudicial error to give instructions 20, 22 and 23.

## III
### INSTRUCTIONS 27 AND 29

Instruction 27[5] is a recitation of section 2309(a) of the Uniform Building Code and instruction 29[6] is a portion of section 2311(a) of the same code. We have carefully examined the entire chapter 2300 and conclude that it relates entirely to permanent buildings and structures and is not applicable to temporary fences or barricades. Temporary fences, barricades, and walkways as described by the evidence in the case at bench are governed by chapter 4400 of

---

[5]Instruction 27 states:

"You are instructed that the ordinance of the City of Bremerton provide, in part, as follows:

"Walls and Structural Framing. (a) General. Walls and structural framing shall be erected true and plumb in accordance with the design. Bracing shall be placed during erection wherever necessary to take care of all loads to which the structure may be subjected."

[6]Instruction 29:

"You are instructed that the ordinance of the City of Bremerton provide, in part, as follows:

"Wind Design. (a) General. Buildings or structures shall be designed to withstand the minimum horizontal and uplift wind pressures of 20 pounds per square foot allowing for wind from any direction."

the Uniform Building Code and section 11.10.010 of the Bremerton Municipal Code under proper instructions. Again, the giving of these instructions injected collateral issues which were not justified by the evidence, pertinent to the case or confined to the issues. *Izett v. Walker, supra; Manzanares v. Playhouse Corp., supra; Brown v. Cannon, supra; Day v. Goodwin, supra.* It was error to give instructions 27 and 29.

## IV
### INSTRUCTION 31

■ Instruction 31 is the WPI damage instruction set forth in WPI 30.01 and 30.04–30.08, to which was added as item 6 "[t]he loss or impairment of the capacity to enjoy life." Defendants claim that the loss or impairment to enjoy life is contained in item 3, physical and mental disability, and that the added phrase, therefore, was duplicative. This same question was presented in *Parris v. Johnson,* 3 Wn. App. 853, 479 P.2d 91 (1970), in which the court stated:

> In considering the meaning of the term "disability" we frequently think in terms of impairment of work capacity. That is probably the easiest form of disability to translate into pecuniary loss. There are, however, other activities which are compensable under the general term of disability. "Man does not live by bread alone" nor does his life consist solely of performing the tasks necessary to buy that bread. In the 24–hour day one–third may be devoted to work, one–third to sleep and one–third to leisure. An impairment of any one of these aspects of life may constitute a disability. *See* 9 Blashfield, Automobile Law and Practice § 386.3 (3d ed. 1967).
>
> Although disability exists as a distinct element of damages, it is frequently a natural concomitant of pain and suffering. The relationship between disability and pain and suffering may be direct or indirect, but the two are so frequently interwoven that a clear distinction cannot be made in many instances.

3 Wn. App. at 859–60.

The court in *Parris* cites 3 L. Frumer, *Personal Injury* § 3.04(1) (1965), for a summary of compensable elements of damage in a personal injury action. In the footnote on page 860 of that opinion we find the following:

> "The elements of compensatory damages for personal injuries are: . . . (5) *physical disability or what is popularly referred to as the incapacity to lead a normal life*; . . .

Disability and incapacity are set out in the disjunctive.

The most recent case in this state relative to this question is *Wooldridge v. Woolett,* 96 Wn.2d 659, 638 P.2d 566, *aff'g* 28 Wn. App. 869, 626 P.2d 1007 (1981). The question presented was whether the value of a person's shortened life expectancy is a separately recoverable item of damages in a survival action. RCW 4.20.046 prohibits the granting of damages to the personal representative of the deceased for pain and suffering, anxiety, emotional distress or humiliation personal to and suffered by the deceased. The amicus brief on behalf of Washington State Trial Lawyers Association generally equated the term "shortened life expectancy" with the impairment of an ability to enjoy the pleasures of life which a person otherwise would have enjoyed and urged the court to find that it was a separate element of damages apart from pain and suffering. However, the court rejected that position and stated at page 665:

> It seems fairly certain the *Parris* court considered the lost enjoyment of life's pleasures as merely a component of damages for pain and suffering—items of damage specifically excluded by the proviso to RCW 4.20.046. Likewise, the Court of Appeals in this case found that insofar as damages for shortened life expectancy imply damages for the loss of life's pleasures and amenities, such damages are "but a component of pain, suffering, anxiety, and distress." (Citation omitted.) *Wooldridge v. Woolett,* 28 Wn. App. 869, 876, 626 P.2d 1007 (1981).

We therefore hold that it was error to give instruction 31 with item 6 included.

## V
### TESTIMONY OF OFFICER LOUN

Police Officer Loun, who arrived at the scene of the accident a short time later, testified on direct examination that Roy Lusk, Jr., a carpenter employed by Drury, said, "We were getting ready to rebrace it when it fell." The defendant Drury objected but the court admitted that testimony on the grounds that it was an admission against interest by an agent of the principal, Drury. The testimony was hearsay. It was not admissible under ER 801(d)(2) because there was no evidence that Lusk, Jr., was a speaking agent acting within the scope of his authority at the time of the statement. *Barrie v. Hosts of Am., Inc.,* 94 Wn.2d 640, 618 P.2d 96 (1980).

Plaintiff contends that it was admissible as an excited utterance under ER 803(a)(2)—a statement relating to a startling event or condition where the declarant was under the stress or excitement caused by the event or condition. As we read the record and as the trial court found, no foundation was laid as to stress or excitement.

Plaintiff also urges that the statement was admissible under ER 801(d)(1) to impeach the testimony of Roy Lusk, Jr., whom plaintiff called as an adverse witness. Lusk, Jr., also testified for the defense but no inquiry was made of him either on direct or cross examination as to the statement to which Officer Loun testified. Plaintiff may have anticipated that Lusk, Jr., would later deny making the statement, which he did not, but in any event, that is not sufficient to lay a foundation for impeachment. It was error to admit this testimony.

The instructional errors necessitate the granting of a new trial and dispose of some of the defendants' additional assignments of error. We have carefully read and considered the remaining assignments of error and find them to be without merit except as hereinafter discussed as to the defendant Olympic Savings and Loan Association.

## VI
## MOTION TO DISMISS OLYMPIC SAVINGS
## AND LOAN ASSOCIATION

At the close of the plaintiff's case and at the close of all of the evidence, the defendant Olympic made a motion to dismiss, which the court denied. The defendant Olympic Savings claims it was error for the court to deny its motion to dismiss.

### A
### AGENCY RELATIONSHIP

The evidence submitted by the plaintiff as to the liability of Olympic Savings consisted of a stipulation to the effect that on November 1, 1977, Olympic Savings and Loan Association owned the building around which the barricade was constructed and that Olympic contracted with the Drury Construction Company for the remodeling project which was under way on November 1, 1977, together with the testimony of three carpenters who testified they were employed by Drury and had worked on the building. The only other evidence as to the agency relationship of Olympic and Drury was offered in defense by Olympic to the effect that Drury had a contract with Olympic and was paid by Olympic and that Olympic had nothing to do with the design, construction, or maintenance of the barricade or the removal of the portion of the barricade for the purposes of moving things in and out.

Olympic contends that it was not liable under the doctrine of respondeat superior because the plaintiff failed to meet her burden of establishing an agency relationship between Olympic and Drury Construction. On the other hand, plaintiff contends that she established an agency relationship between Olympic and Drury by the testimony of Donald Drury that his company was paid by Olympic under a contract to remodel the building.

At the outset we recognize that a challenge to the sufficiency of the evidence admits the truth of plaintiff's evidence and requires that it be viewed in the light most

favorable to her. Likewise, the plaintiff is entitled to the benefit of all reasonable inferences from her testimony. *Heasley v. Riblet Tramway Co.,* 68 Wn.2d 927, 416 P.2d 331 (1966). The law makes no presumption of agency; it is a fact to be proved. 3 Am. Jur. 2d *Agency* § 349 (1962). The burden of establishing agency rests upon the one who asserts it. *Moss v. Vadman,* 77 Wn.2d 396, 463 P.2d 159 (1969); *Koppler v. Bugge,* 168 Wash. 182, 11 P.2d 236 (1932). The question of an agency relationship is a question of fact unless no facts are in dispute and the facts are susceptible of only one interpretation in which case the relationship becomes a question of law. *Graves v. P.J. Taggares Co.,* 94 Wn.2d 298, 616 P.2d 1223 (1980).

■ The prerequisite for agency is set forth in *Moss v. Vadman, supra* at 402–03:

> We have repeatedly held that a prerequisite of an agency is control of the agent by the principal. *McCarty v. King County Medical Serv. Corp.,* 26 Wn.2d 660, 175 P.2d 653 (1946) and cases cited.
>
> We have frequently cited the Restatement of Agency for the proposition that an agency relationship results from the manifestation of consent by one person that another shall act on his behalf and subject to his control, with a correlative manifestation of consent by the other party to act on his behalf and subject to his control.

(Footnote omitted.)

Here the facts are not in dispute. Olympic employed Drury by contract to dismantle and remodel a building on property owned by Olympic. Olympic paid Drury under the contract. Drury also erected and maintained the fences. There was no evidence of control by Olympic. The court should have made this ruling as a matter of law.

## B
### NONDELEGABLE DUTIES

Plaintiff contends that if there was no agency then Olympic is charged with nondelegable duties under the Bremerton Municipal Code and Uniform Building Code provisions that were read to the jury. Olympic argues that

plaintiff failed to show that any of the ordinances or code provisions applied factually to Olympic. As has been already noted above, chapter 17.24 of the Bremerton Municipal Code did not apply to either Drury or Olympic and any nondelegable duty, therefore, could not be predicated on that chapter. Next plaintiff argues that the provisions of section 11.10.010 of the Bremerton Municipal Code imposed a nondelegable duty on Olympic to refrain from maintaining hazardous conditions on its property.

Section 11.10.010 provides:

Maintenance of Hazardous Conditions Prohibited. It is unlawful for the owner and/or any person, firm or corporation occupying or having charge or control of any premises abutting upon any public street, right–of–way or alley, or beneath such public sidewalk area, in the city to construct, place, cause, create, maintain or permit to remain upon any part of said right–of–way located between the curbline, or if there is no curbline, then between the adjacent edge of the traveled portion of such right–of–way and the abutting property line, any condition, structure or object dangerous or hazardous to the use of said right–of–way by the members of the general public, including but not limited to the following conditions:

. . .

(8) Defective handrails or fences or other similar structures within or immediately adjacent to said right–of–way area.

Under 11.10.050, violation of the above ordinance is a misdemeanor. Olympic contends that the above section would violate due process if it is construed as imposing strict criminal liability on an owner who has no actual or constructive notice of the dangerous condition, structure or object. In *Seattle v. Stone,* 67 Wn.2d 886, 410 P.2d 583 (1966), the Supreme Court held unconstitutional as a violation of due process a Seattle city parking ordinance that made the owner of the vehicle responsible for parking violations even though the car was parked illegally by another without the owner's knowledge. Importantly, for our purposes, the court cited with approval *People v. Forbath,* 5

Cal. App. 2d Supp. 767, 42 P.2d 108 (1935), where the court ruled that a vehicle owner could be liable under an ordinance making it unlawful "to allow, permit or suffer" the vehicle to be illegally parked only if the owner knew the vehicle had been illegally parked. In *Boyce v. Adams,* 87 Wn.2d 56, 549 P.2d 18 (1976), the court construed RCW 16.24.070, which makes it unlawful for any person to cause or permit any livestock to graze in a stock–restricted area on public property. The court held that the words "cause or permit" implied the requirement of either actual or constructive notice and that RCW 16.24.070 did not impose strict criminal liability on livestock owners.

██ Section 11.10.010 makes it unlawful for an owner of land abutting public property "to *construct, place, cause, create, maintain or permit to remain* any hazardous condition." In our judgment these words imply that the owner must have notice of the defective condition before liability attaches. Our construction of section 11.10.010 makes an owner's liability under that ordinance the same as the liability of an abutting owner under the common law. An abutting owner is not liable for injuries suffered by a pedestrian on a defective sidewalk even though it constitutes a nuisance, unless it may be shown that the owner or his predecessor in title participated in the creation or continuance of the nuisance. E. Yokley, *Municipal Corporations* § 461(i) (1958). A prerequisite to recover from a property owner for injuries sustained on his premises is a showing that the owner had actual or constructive notice of the condition causing the injury. *Ciminski v. Finn Corp.,* 13 Wn. App. 815, 537 P.2d 850 (1975); *Daggett v. Tiffany,* 2 Wn. App. 309, 467 P.2d 629 (1970).

In this case, there was no evidence that Olympic had anything to do with the design, construction or maintenance of the defective fence. Nor is there any evidence that a bank officer or agent inspected the site or had any knowledge of the defects in the fence prior to the accident. The bare fact that the fence was on the property for several months prior to the accident does not by itself establish

that Olympic had notice of its defectiveness. We hold that Olympic did not owe a duty to plaintiff under section 11.10.010.

Plaintiff contends that Olympic had a nondelegable duty under chapter 44 of the Uniform Building Code. Section 4401 provides:

> No person shall use or occupy a street, alley or public sidewalk for the performance of work under a building *permit* except in accordance with the provisions of this chapter.

(Italics ours.)

There is no claim in this case that Olympic secured the permit for the dismantling and remodeling. The permit was secured by Drury. We are, therefore, of the opinion that chapter 44 is not applicable to Olympic.

Plaintiff cites *Amann v. Tacoma,* 170 Wash. 296, 16 P.2d 601 (1932), for the proposition that if there is a violation of any city ordinance it creates a nondelegable duty and suggests that the language in that case is in exact accord with the Restatement (Second) of Torts § 424 (1965). She cites no case in Washington nor have we found one that adopts Restatement (Second) of Torts § 424 (1965).

The *Amann* case involved the demolition of a building on K Street in the city of Tacoma. The owner of the property had a contract with a general contractor to demolish a building. He in turn subcontracted a part of the work to another. The general contractor secured the permit from the City of Tacoma. The subcontractor was tearing down a wall adjacent to K Street when it fell, killing one child and injuring other persons. Action was brought against the owner of the property, the contractor and the subcontractor. The trial court refused to give an instruction which advised the jury that the making of a contract between the owner, general and subcontractors to demolish the building did not relieve the owner from the obligation to see that the building was demolished in such a manner as to cause the street to be and remain in a reasonably safe condition for travel and use by the public, and that such duty and

132

responsibility still rested with the owner. The Supreme Court said at pages 309–10, "We do not think that the requested instruction announced a correct rule of law, so far as the owner is concerned." The court pointed out that the general contractor was responsible for the actions of the independent subcontractor because the contractor had secured the permit and was under a duty to perform the conditions of the permit and that the general's duty was nondelegable.

The *Amann* case supports our conclusion that Olympic did not have any nondelegable duties based upon any of the ordinances or building code provisions. The court should have granted the motion to dismiss. We therefore reverse the judgment as to the defendant Drury Construction and remand for a new trial. We also reverse as to the defendant Olympic Savings and Loan and remand with directions to dismiss.

REED, C.J., and PETRIE, J., concur.

Reconsideration denied June 18 and July 1, 1982.