[No. 13837–2–III.    Division Three.    June 4, 1996.]

GORDON M. FLINT, *Respondent*, v. PAUL E. HART, ET AL., *Appellants*.

*Sam B. Franklin* and *Lee, Smart, Cook, Martin & Patterson, P.S., Inc.,* for appellants.

*Robert B. Gould, Gloria–Rose James,* and *Law Office of Robert B. Gould,* for respondent.

SWEENEY, C.J. — Under current Washington law, if a plaintiff exercises independent business judgment and elects not to pursue an available legal remedy, the defendant's wrongful act cannot be the proximate cause of the plaintiff's damages. *Horn v. Moberg,* 68 Wn. App. 551, 558, 844 P.2d 452, *review denied,* 121 Wn.2d 1025 (1993). The law firm of Hart & Winfree did not retain a security interest in the general intangibles for Gordon M. Flint when it represented him during the sale of his funeral home business to Michael and Vicki Meyer. The Meyers defaulted and later filed bankruptcy. Mr. Flint settled his claim with the Meyers and sued Hart & Winfree for legal malpractice. A jury returned a verdict in his favor. Hart & Winfree appeals. It contends that its negligence was not the proximate cause of Mr. Flint's damages because he exercised his independent business judgment when he settled his claim with the Meyers. Hart & Winfree further asserts the verdict is not supported by substantial evidence and that the court erred in awarding Mr. Flint attorney fees and prejudgment interest.

We take this opportunity to reexamine the independent business judgment rule. We conclude Mr. Flint's settlement of his claim with the Meyers does not bar his

subsequent negligence action against Hart & Winfree. We affirm the directed verdict on the issue of liability. Because we hold the court erred in instructing the jury on the calculation of damages, we reverse the jury award and remand for a new trial on the question of damages.

## FACTS AND PROCEDURAL POSTURE

In 1985, after more than 30 years in the funeral business, Mr. Flint decided to sell the Flint Funeral Home in Prosser to the Meyers. They agreed on a price of $285,000, payable at 11 percent interest. Mr. Flint retained Hart & Winfree to prepare the sale documents. The sale closed in October of 1985.

In 1986, the Meyers' payments became irregular. Mr. Flint did not take any action and the Meyers made up the delinquent payments. In 1989, the Meyers defaulted. They asked Mr. Flint to reduce the balance owing to $100,000 and to suspend payments for one year. Mr. Flint rejected the proposal and sued to foreclose.

On December 21, the Meyers petitioned for chapter 13 bankruptcy protection. Mr. Flint hired an attorney to assist in the bankruptcy. Mr. Flint filed a creditor's claim for $273,865.23. He soon learned, for the first time, that he did not have a security interest in the general intangibles of the business. He moved to have the automatic stay of the bankruptcy lifted so he could proceed with the foreclosure action. The bankruptcy judge denied the motion. Mr. Flint also moved to dismiss the bankruptcy alleging the Meyers' unsecured debt exceeded the statutory limits for chapter 13.[1] The Meyers challenged the valuation of Mr. Flint's claim.

In August of 1990, the bankruptcy judge ruled that Mr. Flint did not have a security interest in the goodwill of

---

[1]"Only an individual . . . that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $100,000 and noncontingent, liquidated, secured debts of less than $350,000 . . . may be a debtor under chapter 13 of this title." 11 U.S.C.A. § 109(e) (West 1993).

the business nor in its customer lists, accounts receivable or business name. Before the judge ruled on the value of the secured assets, Mr. Flint and the Meyers entered into a settlement agreement which reduced Mr. Flint's claim to $170,000, payable at 7.8 percent interest. The claim was secured by the ongoing funeral business. The settlement was approved by the bankruptcy court on September 23, 1991.

On February 28, 1992, Mr. Flint sued Hart & Winfree alleging it failed to retain a security interest in the general intangibles of the business at the time of sale. The case was tried to a jury. Mr. Flint argued that his damages were $121,919—the difference between the initial sale in 1985 ($285,000) and the 1991 settlement agreement ($170,000) plus interest. He presented the testimony of a real estate broker who valued the funeral home at $290,000 as of July 30, 1990. This included real estate valued at $182,500 and a "business market value" of $110,000 to $137,500. The market value figure included personal property, cars, caskets, pre–needs (prearranged funerals), a covenant–not–to–compete agreement, as well as the goodwill of the business. The broker did not value the intangible assets separately. Hart & Winfree's certified public accountant valued the funeral home at $150,000.

After both sides rested, Mr. Flint moved for a directed verdict on the issue of liability. The court granted the motion. By special verdict, the jury found that Hart & Winfree's negligence was the proximate cause of damages to Mr. Flint. It calculated Mr. Flint's damages as follows:

| | |
|---|---|
| $ 26,177.04 | legal and related expenses associated with the bankruptcy |
| $ 121,919.00 | value of the security interest lost after September 23, 1991 |
| $ 450.00 | attorney fees Mr. Flint paid to Hart & Winfree for the 1985 sale agreement |

| | |
|---|---|
| $ 62,707.88 | value of the security interest lost in the past, together with all interest lost from the time of the default up to September 23, 1991 |
| $ 211,253.92 | Total |

The jury found that Mr. Flint was 24.5 percent comparatively negligent. Hart & Winfree moved for reconsideration, vacation of the verdict or, in the alternative, amendment of the verdict. The court denied the motion. This appeal follows.

## DISCUSSION

*Independent Business Judgment.* We first address the question of whether Hart & Winfree's failure to retain a security interest in the intangibles was the proximate cause of Mr. Flint's damages. Relying on *Horn v. Moberg*, 68 Wn. App. 551, 557, 844 P.2d 452, *review denied*, 121 Wn.2d 1025 (1993), the law firm contends the cause of Mr. Flint's damages was his decision to settle the adversary bankruptcy proceeding. Hart & Winfree's position is that Mr. Flint's exercise of independent business judgment bars the present action. The question presented is one of law. *Id.* at 558.

The independent business judgment rule pits two equally important legal policies against each other. On one hand, this state is firmly committed to a policy of encouraging litigants to settle their differences at any stage of the proceedings. *Kirk v. Moe*, 114 Wn.2d 550, 554–55, 789 P.2d 84 (1990); *Marassi v. Lau*, 71 Wn. App. 912, 918, 859 P.2d 605 (1993). On the other hand, a plaintiff should not, by his or her own actions, be permitted to visit damages upon a hapless defendant. *King v. City of Seattle*, 84 Wn.2d 239, 252, 525 P.2d 228 (1974). The rule is simply stated: "[W]hen a plaintiff by the exercise of independent business judgment elects not to pursue available legal remedies, the wrongful act of the defendant is not the

proximate cause of the plaintiff's damages." *Horn*, 68 Wn. App. at 558.

The business judgment rule was first articulated by our Supreme Court in *King*, 84 Wn.2d at 251. In that case, the Kings brought a mandamus action to require issuance of a street use and building permit by the City of Seattle. After the permits were issued, the United States Corps of Engineers revised an overwater building regulation. The Kings made no attempt to comply with the regulation, but instead abandoned the project. They sued the City, seeking damages and expenses for their lost profit. *Id.* at 242. The Supreme Court reversed the trial court's award of damages. It concluded that the City should not be subject to legal liability because the Kings did not exhaust their federal administrative remedies and did not attempt to avoid their damages. *Id.* at 250–51. Addressing the Kings' contention that they elected not to apply for the federal permit because they did not have the economic resources to pursue the project, the court held "[t]his was a voluntary business judgment." *Id.* at 251. Holding that there was no legal liability (proximate cause) in the City, the Court, at page 251, said, "[i]f this were not so, the plaintiff would be able to create liability in another by his own independent judgment."

But the majority's reasoning in *King* is circular. The mitigation of damages doctrine was inapplicable because the question of whether the Kings had a duty to mitigate presupposed that the City was legally liable for their damages in the first place. *King*, 84 Wn.2d at 251. And legal liability never arose because the Kings, presumably in an attempt to mitigate their damages, decided to abandon the project. *Id.* at 251.

The absence of liability, however, is not because of an independent business judgment. Every settlement is an exercise in independent judgment; some the law recognizes as a valid attempt to mitigate damages. By denominating this particular exercise of judgment as "voluntary business judgment," the majority in *King* eliminated the

proximate cause prong of the negligence action. But it is not the exercise in independent business judgment which leads to this result. It is rather the *King* court's policy decision that some business judgments eliminate proximate cause. The dissent would have imposed liability on the City. It argued that the majority simply denied liability because the plaintiff failed to mitigate damages. *King*, 84 Wn.2d at 254 (Brachtenbach, J., dissenting). The net effect, according to the dissent, is to shield a wrongdoer from liability.

The next case decided on the basis of the independent business judgment rule is *Hillis Homes, Inc. v. Snohomish County*, 32 Wn. App. 279, 647 P.2d 43, *review denied*, 98 Wn.2d 1011 (1982). There, a developer petitioned for a writ of mandamus and damages after the County failed to approve his application for a preliminary plat within the required 90 days. Even though the court later issued the writ, the developer sued the County for damages. *Id.* at 280–81. Division One held that the County's failure to act was not the proximate cause of the developer's claimed damages. *Id.* at 285. The court noted that even if the developer's application had been processed timely, the developer would not have had the right to begin construction. *Id.* at 285. The developer's only right was to have the application processed within 90 days. And, even at that, the County could still approve, disapprove, or return the proposed preliminary plat application for modification or correction. *Id.* at 285. The court held that the County's liability could not be "premised on the developer's independent business judgment that it would be more advantageous to informally work with the County rather than promptly pursuing its legal remedies once the 90 days had expired." *Id.* at 285.

In *Grader v. City of Lynnwood*, 53 Wn. App. 431, 767 P.2d 952, *review denied*, 113 Wn.2d 1001, *cert. denied*, 493 U.S. 894 (1989), the City of Lynnwood approved a conditional use permit for Grader to build a billiard parlor/warehouse. The building was to be constructed on prop-

erty located next to Grader's other developed property. *Id.* at 433. The City required him to get a building permit. Grader negotiated informally with the City but ultimately concluded the City was not going to cooperate in issuing the building permit. He sued for damages. The jury returned a verdict in his favor. *Id.* at 434–36.

Division One reversed. It concluded that any loss was the result of Grader's independent business judgment. *Grader*, 53 Wn. App. at 442. The series of business decisions made by Grader, however, was compelling. The City had asked him to abate nonconforming uses on his adjoining lots as a condition of issuing the building permit. He refused because "he wished to maintain a consistent relationship with the existing businesses." *Id.* at 442. The City then asked him to produce the leases on the adjoining property which he claimed would be affected by the City imposed requirements for a building permit. Again he refused. *Id.* at 442. And most significantly, he finally decided not to seek the building permit. *Id.* at 442. Not surprisingly, the Court of Appeals concluded that the denial of the building permit—for which Grader never applied—was not the proximate cause of any damage as a matter of law.

One conclusion which can be distilled from *King, Hillis*, and *Grader* is that before a municipality should be subjected to damages for its failure to act, the plaintiff should exhaust available administrative remedies. For us, however, the transition from that conclusion to a categorical application of the independent business judgment rule is strained.

The first application of the independent business judgment rule in other than an administrative context was *Marsh v. Commonwealth Land Title Ins. Co.,* 57 Wn. App. 610, 789 P.2d 792, *review denied,* 115 Wn.2d 1025 (1990). There, Marsh decided to refinance an apartment building in order to satisfy existing encumbrances and place its lienholder in a first position by a deed of trust. Commonwealth, as the escrow agent, recorded a deed of trust

with an incorrect legal description. *Id.* at 611. Marsh later filed for protection under chapter 11 of the bankruptcy code. Commonwealth re–recorded the deed within 90 days of Marsh's petition in bankruptcy. Because of the potential that the deed of trust securing Marsh's loan would be declared a voidable preference, Marsh negotiated an unfavorable settlement with an unsecured creditor to protect his interest in the deed of trust. *Id.* at 613. He then sued Commonwealth. The trial court found the re-recording was a voidable preference. *Id.* at 614. It awarded Marsh damages on the theory that Commonwealth's actions had weakened Marsh's negotiating position with the unsecured creditor and placed Marsh in a "vulnerable legal position." *Id.* at 616–17.

Division One interpreted "vulnerable legal position" to mean no more than "a realistic possibility of an adverse decision." *Marsh*, 57 Wn. App. at 617. It concluded that Marsh had not suffered any legal damages from the Commonwealth mistake until he paid the settlement with the unsecured creditor. *Id.* at 618. "Whether or not the Commonwealth mistake would ever have caused [Marsh] any actual damage was never determined." *Id.* at 618. The court concluded that Marsh's decision to settle with the unsecured creditor was a matter of independent business judgment.

The court in *Marsh* interpreted *King* as holding that "where there is a realistic possibility of correcting the wrongful act complained of by pursuing available legal remedies, and the plaintiff by the voluntary exercise of independent business judgment elects not to pursue those available remedies, the defendant's wrongful act is not the proximate cause of plaintiff's damages." *Id.* at 619–20. It is equally clear, however, that Marsh's precarious position (a finding made by the trial court) was the result of a mistake made by Commonwealth. Having been put in that difficult position, Marsh evaluated the risk that his note might be pulled into the bankruptcy as an unsecured asset, and decided to settle. Marsh may have prevailed. But

it is also possible Marsh may not have prevailed, or may have prevailed at such a great expense that it would be a Pyrrhic victory.

Finally, we come in our review of the independent business judgment rule to the case relied on by Hart & Winfree, *Horn v. Moberg*, 68 Wn. App. 551, 844 P.2d 452, *review denied*, 121 Wn.2d 1025 (1993). There, Horn was originally represented by the defendant in a products liability claim. On the advice of the defendant, Horn concluded the lawsuit was probably without merit and that he would not prevail. He dismissed his claim against the manufacturer, prompted by concerns that the manufacturer might obtain an award of attorney fees if the court concluded the lawsuit was frivolous.

Horn later filed a professional negligence action against the defendant, alleging the attorney had not properly prepared the case for trial. Defendant argued that Horn's dismissal of the product liability claim was an exercise of independent business judgment. The defendant asserted that even if he was negligent, his negligence was not the proximate cause of the loss. The court held that even though Horn might have been influenced by counsel's representations, he had nonetheless exercised independent business judgment. *Horn*, 68 Wn. App. at 559. The threat of possible "financial repercussions [did] not prevent the Horns' dismissal . . . from being intentional and voluntary." *Id.* at 559. The court concluded that when a plaintiff exercises independent business judgment and elects not to pursue available legal remedies, the wrongful acts of the defendant are not the proximate cause of the plaintiff's damages. *Id.* at 558. Legal causation was therefore absent. *Id.* at 560.

As in *Marsh*, Horn was put in a precarious position by the alleged negligence of others. Horn concluded that the wisest course of action was to dismiss the case. Clearly, this was an exercise of independent business judgment. It may well be, however, a sound exercise of judgment. The problem with a categorical application of the independent

business judgment rule is that it does not accommodate those sound exercises of business judgment which result in settlements.

Every decision to settle a lawsuit, at any stage of a proceeding, is an exercise of independent judgment. If applied categorically, the independent business judgment rule eliminates any potential for further negligence claims following settlement of a claim. In so doing, the rule discourages settlement, particularly in those cases in which the very predicament, which prompts settlement in the first place, is the result of another's negligence. While a potential tort plaintiff should not be able to burden another with legal liability by settling in some cases, not every settlement is unwise, ignores the law, or sets up a malpractice case. Many settlements are a reasonable response to a difficult situation created by another's negligence.

The independent business judgment rule also tends to favor litigants who have the financial wherewithal to proceed with litigation. It has the potential to discriminate against litigants who may be forced into early settlements because they cannot risk the cost and expense attendant with litigation. For these reasons, we disagree with the rationale of *Horn* and *Marsh*, and the categorical application of the independent business judgment rule. The independent business judgment rule should be applied on a case–by–case basis.

In the instant case, Mr. Flint settled his claim with the Meyers only after the bankruptcy court had ruled he did not have a perfected security interest in the intangible assets of the business. While that was an exercise of independent business judgment, it may well have been a sound exercise of business judgment. We, therefore, conclude that Mr. Flint's subsequent claim against Hart & Winfree is not barred by the independent business judgment rule. The plaintiff has an obligation to mitigate damages. *Smith v. King*, 106 Wn.2d 443, 450–51, 722 P.2d 796 (1986). The reasonableness of his or her conduct in doing so is a ques-

tion for the jury. *Sutton v. Shufelberger*, 31 Wn. App. 579, 582, 643 P.2d 920 (1982).

*Damage Award.* Hart & Winfree next contends the jury verdict resulted in a windfall for Mr. Flint. It reasons that in 1985 Mr. Flint sold the business to the Meyers for $285,000, receiving a $40,000 down payment. Ignoring the payments the Meyers made (for almost four years) prior to the bankruptcy and any unpaid accrued interest, Hart & Winfree calculates the amount owing to Mr. Flint at the time of bankruptcy was approximately $245,000. Under the settlement agreement, the Meyers were obligated to pay Mr. Flint $170,000 plus interest. Hart & Winfree reasons that if this court allows the jury award to stand, Mr. Flint will receive $210,000 ($40,000 + $170,000) and $211,253.92 (the jury's award of damages before Mr. Flint's comparative negligence). That results in Mr. Flint's total receipt of over $421,000 on a business he originally sold for $285,000. We agree that this jury verdict is a windfall to Mr. Flint.

In *Tilly v. Doe*, 49 Wn. App. 727, 746 P.2d 323 (1987), *review denied*, 110 Wn.2d 1022 (1988), the seller's attorney failed to obtain and perfect a security interest in the assets of a farm equipment dealership. The seller sued the attorney for negligence. The principal issue at trial was the valuation of the assets which should have secured the claims. The trial court valued the collateral at its auction price. On appeal, the sellers urged the proper measure of damages was the fair market or going concern value of the collateral.

The "value of a security interest lost through another's negligence is 'the value of the loss of the security interest, not the value of the personal property.' " *Tilly*, 49 Wn. App. at 731 (emphasis omitted) (quoting *Hecomovich v. Nielsen*, 10 Wn. App. 563, 573, 518 P.2d 1081 (1974)). Division One noted the "fair market measure should not apply if the application of that measure of damages would result in a windfall to the plaintiff." *Id.* at 731 (evidence of collectibility produced at trial would be rele-

vant). This holding was "consistent with the purpose of awarding damages for injury to property in tort actions; *i.e.*, to place the injured party in the condition in which he would have been had the wrong not occurred." *Id.* at 731–32. It was also consistent with the rule that "the measure of recovery in attorney malpractice actions is the amount of loss actually sustained as a proximate result of the conduct of the attorney." *Id.* at 732 (emphasis omitted).

One complication present in the instant case is that the record is unclear as to the exact nature and value of the intangible assets in which Hart & Winfree allegedly failed to retain a security interest. The briefs do not clarify that mystery. Hart & Winfree alleges at page 19 of their brief that Mr. Flint did not sell the accounts receivable. This is supported by citation to the record. Report of Proceedings at 192–93. It also alleges that Mr. Flint had a security interest in the funeral home's permanent records (an ongoing customer list, Ex. 57), and that the Meyers released their claim in the Flint business name (the name of the funeral home was changed to Meyer Funeral Home). According to Hart & Winfree, therefore, the only unsecured intangible asset was goodwill. Yet, the bankruptcy court held that Mr. Flint did not have a security interest in the goodwill of the business, the customer lists, accounts receivable or business name.

At trial, Mr. Flint did not present any specific evidence of the value of the unperfected security interest in goodwill. His expert's valuation of the "intangibles" also included the value of personal property items.

The court's damage instructions to the jury do not direct the jury to calculate the value of the goodwill asset. Instruction 20 tells the jury that to calculate Mr. Flint's damages it must "determine the amount of money required to compensate Mr. Flint reasonably and fairly for the total amount of damages which were proximately caused by the negligence" of Hart & Winfree. Instruction 16 indicated that Hart & Winfree was "liable for any damage which was proximately caused by failing to perfect

the necessary security interests." Hart & Winfree's proposed instruction 33 was rejected by the court. That instruction was more specific:

> If you find that it is more likely than not that there is any substantial part of the property in which Plaintiff Flint should have been granted a security interest which he could not have recovered by pursuing his legal remedies in the Bankruptcy Court, *you must determine the value of that asset or assets and the value you determine will be the measure of damages suffered by the Plaintiff.*

(Emphasis added.)

The court's instructions are flawed. They did not instruct the jury to calculate the damages which would place Mr. Flint in the condition he would have been had the wrong not occurred. *Tilly*, 49 Wn. App. at 732. The instructions, as given, did not advise the jury that the value of the security interest lost through another's negligence is the "value of the loss of the security interest . . . ." *Id.* at 731 (emphasis omitted).

■ Instructions are sufficient if they are supported by substantial evidence, allow each party to sensibly argue his or her theories of the case and when read as a whole properly inform the jury of the applicable law. *Tennant v. Roys*, 44 Wn. App. 305, 308, 722 P.2d 848 (1986); *Jensen v. Beaird*, 40 Wn. App. 1, 15, 696 P.2d 612, *review denied*, 103 Wn.2d 1038 (1985). Because an instruction was not given on the value of the unsecured goodwill asset, the jury was not informed as to the applicable law and Hart & Winfree may not have been able to argue its case. The court's refusal to properly instruct on damages was error. We therefore reverse and remand for a new trial on the question of damages.

Because it may be relevant on remand, we briefly address Hart & Winfree's argument that the court erred in awarding Mr. Flint attorney fees and prejudgment interest.

■ ■ *Attorney Fees as an Element of Damages.* At-

torney fees may be awarded if authorized by contract, statute or recognized ground in equity. *Lyzanchuk v. Yakima Ranches Owners Ass'n, Phase II, Inc.*, 73 Wn. App. 1, 7, 866 P.2d 695 (1994). An equitable ground exists "when the natural and proximate consequences of a wrongful act by defendant involve plaintiff in litigation with others . . . ." *Armstrong Constr. Co. v. Thomson*, 64 Wn.2d 191, 196, 390 P.2d 976 (1964) (quoting *Wells v. Aetna Ins. Co.*, 60 Wn.2d 880, 882, 376 P.2d 644 (1962)); *Brock v. Tarrant*, 57 Wn. App. 562, 570, 789 P.2d 112, *review denied*, 115 Wn.2d 1016 (1990).

Here, the wrongful act of Hart & Winfree involved Mr. Flint in litigation with the Meyers. The factors creating liability are: (1) a wrongful act or omission by Hart & Winfree toward Mr. Flint; (2) the act or omission exposes or involves Mr. Flint in litigation with the Meyers; and (3) the Meyers were not connected with the initial transaction or event, namely, the wrongful act or omission of Hart & Winfree toward Mr. Flint. *Manning v. Loidhamer*, 13 Wn. App. 766, 769, 538 P.2d 136, *review denied*, 86 Wn.2d 1001 (1975). Mr. Flint became involved in the litigation only because he did not have a secured interest in the goodwill and could not take back the funeral home. Had he been able to take the business back, he would have done so. At the least, he would have been a fully secured creditor in the bankruptcy. The fact that there may have been other reasons for the Meyers' bankruptcy, or that the Meyers prolonged the litigation, is not the relevant inquiry. The focus is whether Mr. Flint would have been involved in litigation with the Meyers, apart from Hart & Winfree's conduct. *Tradewell Group, Inc. v. Mavis*, 71 Wn. App. 120, 128, 857 P.2d 1053 (1993) (party may not recover attorney fees under the theory of equitable indemnity if, in addition to the wrongful act or omission, there are other reasons why he or she became involved in litigation with another). The answer to that question is no. If he prevails on remand, Mr. Flint would be entitled to an award of attorney fees.

*Prejudgment Interest.* Hart & Winfree also contends that the court erred in awarding prejudgment interest.

Prejudgment interest is awardable when the amount claimed is liquidated. *Aker Verdal A/S v. Lampson, Inc.*, 65 Wn. App. 177, 189, 828 P.2d 610 (1992). A claim is liquidated when damages are easily computed by reference to objective sources. *Walla Walla County Fire Protec. Dist. 5 v. Washington Auto Carriage, Inc.*, 50 Wn. App. 355, 358, 745 P.2d 1332 (1987). A liquidated claim occurs when the "evidence furnishes data which, if believed, makes it possible to compute the amount [owed] with exactness, without reliance on opinion or discretion.' " *Kiewit–Grice v. State*, 77 Wn. App. 867, 872, 895 P.2d 6 (quoting *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968)), *review denied*, 127 Wn.2d 1018 (1995).

Prejudgment interest is also awardable when the amount of an unliquidated claim is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion. *Kiewit–Grice*, 77 Wn. App. at 872.

The trial court here awarded Mr. Flint prejudgment interest on three items as follows:

(1) $450.00 — the amount awarded by the jury for the attorney fees paid by Mr. Flint to Hart & Winfree in 1985 for the preparation of the initial sale documents.

(2) $26,177.04 — the amount awarded by the jury for legal and related expenses associated with the bankruptcy.

(3) $62,707.88 — the amount awarded by the jury for the security interest lost in the past, together with all interest lost from the time of the default up to September 23, 1991.

Prejudgment interest on the $450 attorney fees award was proper. Hart & Winfree did not challenge the reasonableness of the award of $450 attorney fees (which were payable to them). And the jury was not charged with determining its reasonableness. *See Tri–M Erectors, Inc. v. Donald M. Drake Co.*, 27 Wn. App. 529, 537, 618 P.2d 1341 (1980), *review denied*, 95 Wn.2d 1002 (1981).

To the extent the $26,177.04 award for legal and related expenses concerns "reasonable" attorney fees, the award is unliquidated and the award of prejudgment interest was improper. The costs included in the award, however, are liquidated.

Finally, the $62,707.88 award for the value of the security lost from default through the settlement agreement is unliquidated. Its calculation required the exercise of the jury's discretion. The amount was not calculated with exactness or without reliance on opinion. Even though the jury may have accepted the testimony of Mr. Flint's witness to the penny, it did not have fixed standards to apply in computing the amount of the lost security interest. The court on remand will apply these principles, as necessary.

The directed verdict on the issue of liability is affirmed; the judgment entered on the jury award is reversed. The matter is remanded for a new trial on the question of damages.

THOMPSON and SCHULTHEIS, JJ., concur.